# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Kevin Cooper and Brenda Cooper,

|  | | |
|---|---|---|
| | Plaintiffs, | Case No. 13-cv-12740 |
| | | Hon. Judith E. Levy |
| v. | | Mag. Judge Michael J. Hluchaniuk |

Temple-Inland, Inc. and
International Paper Co.,

                    Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' [13] MOTION
## FOR SUMMARY JUDGMENT

This is a negligence case. Plaintiffs are Kevin Cooper and his wife Brenda Cooper. Defendants are Temple-Inland, Inc., a Delaware corporation, and International Paper Company, a New York corporation. Kevin Cooper ("Cooper") worked for Home Depot at a facility in Romulus, Michigan. Cooper was a forklift operator whose job was to load and unload boxcars. He was injured while unloading a boxcar filled with particle board shipped by defendants to Home Depot. Cooper is suing defendants for negligence and loss of consortium.

Before the Court is defendants' Motion for Summary Judgment (Dkt. 13). Defendants argue (1) they had no legal duty of care to Cooper, and (2) Cooper's actions in unloading the boxcar were negligent or reckless, and were the sole or a superseding proximate cause of his injuries. For the reasons discussed below, the Court will deny the motion.

## I.    Factual Background

Cooper worked at a Home Depot warehouse in Romulus, Michigan. He unloaded goods delivered to Home Depot, sometimes using a forklift. Cooper was certified to drive the type of forklift he was using at the time of his injury. (Dkt. 18-9, Ex. H to Pl.'s Resp., Cooper Dep. 19-20 [hereinafter "Cooper Dep."]).

### A.    Shipment of particleboard

On April 12, 2012, defendants shipped two boxcars containing bundles of particleboard to Home Depot's facility in Romulus, Michigan. (Dkt. 13-3, Ex. A to Defs' Br.). One boxcar contained 52 bundles, the other 28. (*Id*.). Defendants had packed the boxcars and sent them from defendants' facility in Thomson, Georgia. (*Id*.).

**B.     Cooper unloads the boxcar and is injured**

On April 20, 2012, Cooper and other Home Depot employees unloaded the boxcars.  Cooper unloaded the first boxcar.   Although Cooper  had unloaded boxcars from defendants before (Cooper Dep. 96), upon opening this boxcar he noticed there was "more dunnage than usual." (*Id.* at 90).  "Dunnage" refers to the packing material used to prevent the load from shifting during transport.  In Cooper's experience, boxcars typically contained a maximum of 12 particleboard sheets used as dunnage: "two sheets, product, two sheets, airbag, two sheets" in both the front and the back sections of the boxcar.  (*Id.*).  But in this boxcar, the dunnage consisted of "two sheets, the product, approximately ten sheets, airbag, approximately ten sheets." (*Id.*). Cooper had never before seen dunnage like this.  (*Id.*).  He nonetheless felt that he could safely remove the dunnage and unload the car.  (*Id.* at 97).

Cooper was wearing work gloves, a hardhat, and non-safety glasses.  (*Id.* at 102).  He began unloading the car by cutting and removing the airbag.  (*Id.* at 97-98).  He then removed the top three units of product with the forklift.  (*Id.* at 98).  Cooper next removed the

3

bottom three units. (*Id*. at 105). He then removed by hand the 22 sheets of particleboard dunnage, each ½ inch thick and 4 feet wide by 10 feet long. (*Id*. at 100, 103). He removed the sheets one at a time. (*Id*. at 103). Cooper had removed particleboard dunnage by hand before, and had seen other Home Depot associates do the same. (*Id*.). According to Cooper, management knew that employees removed dunnage by hand and had not told plaintiff he should do otherwise. (*Id*.).

Cooper proceeded to remove the six units of product from the back of the car. (*Id*. at 105). He then went into the car to remove the 22 sheets of particleboard dunnage from the back of the car. (*Id*. at 106).

Cooper tried to push the sheets over to the floor of the car before pulling them all out with the forklift, but the space inside the car was too small to do so. (*Id*. at 106-07). Cooper began removing the sheets by hand. (*Id*. at 107). After unloading 4-5 sheets, Cooper returned to remove a sixth sheet; at that point, the remaining sheets fell on top of him. (*Id*. at 107-08). Cooper yelled for help. (*Id*. at 108). His coworker Richard Szmagaj attempted to remove the sheets from on top of him, but had to get help from others nearby, including Richard Jordan, the

general manager of the Romulus facility, and John Hall, Cooper's immediate supervisor. (*Id.* at 110). Cooper was taken to the hospital by EMS. (*Id.* at 111). His injuries included fractures of his pelvis and clavicle. (Dkt. 1, Notice of Removal 6).

### C.   Home Depot's and defendants' responses to the incident

After plaintiff's injury, Jordan prepared an incident report. (Dkt. 13-9, Ex. G to Defs' Br. 2). Jordan wrote that Home Depot would "review and reinforce the correct procedures for unloading dunnage in railcars" as part of its response to the incident. (Dkt. 18-5, Ex. D to Pl.'s Resp., Jordan Dep. 33 [hereinafter "Jordan Dep."]). Jordan testified at his deposition that before the incident, employees "had some latitude to modify or to deviate" from procedures for unloading dunnage, but that henceforth the procedures would be strictly enforced. (*Id.* at 34). The report also includes Jordan's response to a question about the "root cause" of the incident: "Pending a complete investigation, it 'appears' he [plaintiff] was standing directly in front of the sheets as opposed to using his forks at the appropriate height to catch and take the dunnage out of the Rail Car." (Dkt. 13-9, Ex. G to Defs' Br. 2).

Jordan testified that Cooper's actions – specifically, attempting to knock the particleboard dunnage down with the forklift, and then removing the dunnage manually, did not violate any Home Depot policy or procedure at the time. (Jordan Dep. 59, 69). Jordan did not know, however, whether other employees had taken similar steps to remove particleboard dunnage before. (*Id.* at 60). Jordan testified that no one, including Cooper, was disciplined for the incident. (*Id.* at 67). Jordan agreed, however, that Cooper had not followed the rule in Home Depot's internal guide titled "Receiving Railcar Unloading & Put-Away" that required Cooper to engage the forks of his forklift in the load before getting out of the forklift. (*Id.* at 74; Dkt. 13-8, Ex. F to Defs' Br. 11).

Hall testified that before April 20, 2012, Home Depot had only received one other boxcar shipment from these defendants. (Dkt. 18-3, Ex. B to Pl.'s Resp., Hall Dep. 58 [hereinafter "Hall Dep."]). Hall also testified that he had seen workers unload particleboard dunnage by hand many times, and that "[y]ou can almost never unload a car without getting off the forklift." (*Id.* at 47, 98-99). On the same day of the incident, after Cooper had been taken to the hospital, Hall had another worker, Thomas Harden, unload the second boxcar. (*Id.* at 63).

Hall took photographs as Harden unloaded the car, in order to "show [management] some of the situations and hazards that we could run into unloading a car loaded this way." (*Id.* at 58).

Cooper's coworker Richard Szmagaj testified that he had unloaded 20-25 boxcars from Temple-Inland during his time at the Romulus facility. (Dkt. 18-2, Ex. A to Pl.'s Resp., Szmagaj Dep. 53 [hereinafter "Szmagaj Dep."]). Those cars were also loaded with particleboard dunnage in a manner similar to the car unloaded by Cooper. (*See id.* at 53-55). Szmagaj testified that he had gotten off of his forklift before when unloading particleboard dunnage sheets: "I had to get off my hi-lo to take each individual sheets [sic] that were between that and grab them and put them on the side. There was no way to . . . you can't drive your hi-lo and pick those sheets up." (*Id.* at 55).

At Jordan's instruction, Hall contacted defendants to ask them to stop using large sheets of particleboard dunnage and to use a different type of dunnage instead. (Hall Dep. 64; Jordan Dep. 25). Jordan and Hall, along with Jordan's boss, Todd Wyatt, had determined that defendants' use of particleboard dunnage "was an unacceptable amount of weight" that "presented itself as a safety hazard." (Jordan Dep. 28).

7

Defendants thereafter began using cardboard and airbags for dunnage, after having proposed this new system verbally to Hall. (*Id.* at 26).

## D.  This litigation

Cooper brought this suit in Wayne County Circuit Court, Michigan on March 7, 2013, alleging negligence and loss of consortium. (Dkt. 1, Notice of Removal 6). He seeks monetary damages for his injuries, including for pain and suffering, mental distress, and loss of enjoyment of life; for lost wages and earning capacity; for medical expenses; and for loss of support, companionship, and consortium. Defendants removed the case to this Court on June 20, 2013. Defendants filed their motion for summary judgment on March 17, 2014. The Court held a hearing on the motion on September 11, 2014.

## II.  Standard of Review

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir.2002)).

## III.  Analysis

To succeed on a claim for negligence, a plaintiff must prove that (1) the defendant owed the plaintiff a legal duty; (2) the defendant breached the legal duty; (3) the plaintiff suffered damages; and (4) the defendant's breach was a proximate cause of the plaintiff's damages. *Roulo v. Auto Club of Mich.*, 386 Mich. 324, 328, 192 N.W.2d 237 (1971). Defendants maintain that Cooper cannot establish the elements of duty and proximate causation.

First, defendants argue that Michigan law precludes non-parties to a contract from suing the parties to the contract for negligent performance of their contractual obligations.  In those circumstances, a plaintiff must establish that a defendant owed him a duty "separate and distinct" from the defendant's contractual obligations.  Here, defendants

maintain, Cooper's claims are based solely on the contractual relationship between defendants and Home Depot. Defendants therefore owed no independent duty of care to Cooper.

Second, defendants argue that Cooper's own negligence in unloading the boxcar was either the sole proximate cause, or a superseding proximate cause, of his injuries, relieving defendants of any liability.

## A.   Whether defendants owed Cooper a duty of care

### 1.   Relevant Michigan case law

Defendants rely primarily on three Michigan Supreme Court cases in arguing that they did not owe a duty of care to Cooper "separate and distinct" from their contractual obligations to Home Depot.

#### a.   *Fultz v. Union Commerce Assocs.*

The first case is *Fultz v. Union Commerce Assocs.*, 683 N.W. 2d 587 (Mich. 2004). Fultz slipped and fell on an icy parking lot, sustaining injuries. She sued the owner of the parking lot, as well as the snow removal contractor who had failed to plow and salt the parking lot. The Michigan Court of Appeals affirmed the jury's verdict

10

that the contractor had a common-law duty to Fultz to provide snow removal service in a reasonable manner, and had breached that duty by failing to plow and salt the lot.

The Michigan Supreme Court reversed, holding that the contractor had no duty to the plaintiff separate from its contractual duty to remove the snow and ice from the lot. The Court noted that in cases involving tort claims based on a defendant's contractual obligations, Michigan courts had distinguished between a defendant's misfeasance of those obligations (tort liability present) and nonfeasance of those obligations (no tort liability). 683 N.W.2d at 591-92. The Court rejected that traditional distinction, opting instead to condition a defendant's liability on the violation of a legal duty "separate and distinct" from the defendant's contractual obligations. *Id.* at 592. The Court then held that Fultz's claim was really that the contractor had breached its contractual obligation to plow and salt the lot. *Id.* That is, the contractor had no duty to Fultz that was "separate and distinct" from its contractual obligations.

In arriving at its holding, the Court distinguished an earlier case, *Osman v. Summer Green Lawn Care, Inc.*, 532 N.W.2d 186 (Mich.

1995).  That case also involved a slip-and-fall negligence claim against a snow removal contractor.  But in *Osman*, the contractor <u>had</u> plowed the parking lot.  But the contractor had created a "new hazard" by piling snow in an area where the contractor should have known the snow would melt and refreeze on the adjoining sidewalks.  *Fultz*, 683 N.W.2d at 593.

b.    <u>*Loweke v. Ann Arbor Ceiling & Partition Co., L.L.C.*</u>

In the second case, *Loweke v. Ann Arbor Ceiling & Partition Co., L.L.C.*, 489 Mich. 157, 809 N.W.2d 553 (Mich. 2011), the Michigan Supreme Court clarified its holding in *Fultz*.  The plaintiff in *Loweke* was an electrician working for a subcontractor on a construction project at Detroit Metropolitan Airport.  The defendant was a carpentry subcontractor on the same job.  The plaintiff was injured when sheets of cement board, which defendant had placed against a wall, fell on the plaintiff.  The trial court granted summary judgment for the defendant, relying on *Fultz* in finding that, because the defendant's contract required it to secure the cement board at the project site, the plaintiff's tort claim was not separate and distinct from the defendant's contractual obligations.  The Court of Appeals affirmed.

12

The Michigan Supreme Court reversed.  The Court characterized the issue before it as "when a duty of care arises between a party to a contract and a noncontracting third party." *Loweke*, 809 N.W.2d at 556-57.  The Court first clarified that the proper analysis under *Fultz* was not "whether a defendant's conduct was separate and distinct from the obligations required by the contract or whether the hazard was a subject of or contemplated by the contract." *Id.* at 559.  Rather, the analysis should focus on "whether any *legal duty* independent of a contract existed." *Id.* at 560.  Such a separate legal duty could arise, for example, by statute, by virtue of a special relationship between the parties, or by the "generally recognized common-law duty to use due care in undertakings." *Id.*  Thus, "the existence of a contract . . . does not extinguish duties of care otherwise existing." *Id.* at 561 (internal quotation marks and citation omitted).

Applying this framework to the case before it, the Court held that, although the defendant's conduct was contemplated by the contract, the defendant "was not relieved of its preexisting common-law duty to use ordinary care in order to avoid physical harm to foreseeable persons and property in the execution of its undertakings." *Id.* at 562.  The Court

13

stated that "[u]nder *Fultz*, <u>a contracting party's assumption of contractual obligations does not extinguish or limit separate, preexisting common law or statutory tort duties owed to noncontracting third parties in the performance of a contract.</u>" *Id.* (emphasis added).

   c.   *Hill v. Sears, Roebuck & Co.*

   In the third case, *Hill v. Sears, Roebuck & Co.*, 822 N.W.2d 190 (Mich. 2012), the plaintiff, Hill, was a homeowner who sued the company that had sold, delivered, and installed her electric dryer.  The previous owners had failed to cap a natural gas line connected to their dryer.  Soon after buying the home, Hill had the defendant install an electric dryer.  Four years later, Hill inadvertently opened the valve to the uncapped gas line.  That night, her daughter lit a candle and the house exploded.

   Hill sued, alleging the defendant had negligently failed to discover the uncapped gas line and to cap it or tell her about it.  The defendant moved for summary disposition; the circuit court denied the motion on the ground that the defendant had a duty not to make the uncapped

line more dangerous by "concealing" it with the dryer.  The Michigan Court of Appeals affirmed.

The Michigan Supreme Court reversed.  The court first noted that "before a duty can be imposed" in a negligence action, "there must be a relationship between the parties and the harm must have been foreseeable."  *Hill*, 822 N.W.2d at 196 (internal quotation marks and citation omitted).  The Court first considered the relationship between the homeowner and the dryer installer, concluding that their relationship was limited to proper delivery and installation of the dryer. *Id.* at 197.  The Court reasoned that while the defendant was obligated to use due care in delivering and installing the dryer, it had not assumed further obligations with respect to the rest of plaintiff's home. *Id.* at 199-200.  In fact, the plaintiff maintained control of the rest of the home, and was the party best situated to "provide a place of safety for themselves."  *Id.* at 199, 201.  The Court expressed reluctance to impose a duty to act affirmatively to "protect customers from potential hazards."  *Id.* at 201.

The Court further held that defendants had not created a "new hazard": "The hazard – the uncapped gas line – was present when

15

defendant installers entered the premises, and it was present when they left it.  The placement of the dryer did not affect the existence or nature of the hazard in any manner because the danger posed . . . was exactly the same before and after the electric dryer was installed."  *Id.* at 202.

2.    The parties' arguments

Relying on the above three cases, defendants maintain they are entitled to judgment as a matter of law because (1) Cooper's claims are based solely on the contractual relationship between defendants and Home Depot, and 2) defendants did not create a "new hazard."  (Dkt. 13, Defs' Br. 7-9).

Cooper responds primarily by arguing that defendants have misinterpreted the governing Michigan case law.  He maintains that defendants had a preexisting common-law duty to him, independent of the contract with Home Depot, to use ordinary care in loading the boxcar.

3.    Analysis

a.  <u>The relationship between defendants' contractual obligations and Cooper's tort claims</u>

Defendants' first point appears to rest on a misunderstanding of *Fultz*, *Loweke*, and *Hill*. Those cases do <u>not</u> establish that tort claims based on conduct that falls within a defendant's contractual obligations cannot be sustained by a non-party to the contract. To the contrary, *Loweke* is clear that parties performing contractual obligations may still have a common-law duty of care to non-parties. 809 N.W.2d at 561-62.

Indeed, the facts in *Loweke* are analogous to those here. In each case, the conduct at issue – in *Loweke*, the storage of the cement boards, here, the loading of the boxcar – was undertaken based on the defendant's contractual obligations. Nonetheless, in *Loweke*, the defendants still had a "preexisting common-law duty to use ordinary care" in performing those contractual obligations "in order to avoid physical harm to foreseeable persons and property." *Loweke*, 809 N.W.2d at 562. The same goes for defendants in this case: they had a preexisting common-law duty to use ordinary care in loading the boxcar in order to avoid harm to foreseeable persons.

i.  *Foreseeability*

17

As a worker tasked with unloading the boxcar, Cooper was such a "foreseeable person."   Cooper worked for Home Depot unloading boxcars.  Defendants purposefully shipped the boxcar to Home Depot. Defendants cannot claim it was unforeseeable that someone at Home Depot would unload the boxcar.

Defendants try a different tack in their reply brief, arguing that Cooper's alleged <u>negligence</u> was not foreseeable, and therefore defendants owed no duty to him.   (Dkt. 21, Defs.' Reply 1-2). Specifically, defendants maintain they could not have foreseen "that anyone would unload the boxcar in reckless disregard for common sense and employer training."   (*Id.* at 2).   But defendants have cited no authority for the proposition that the Court should consider not whether it was foreseeable that someone would unload the boxcar, but whether it was foreseeable that someone would <u>negligently</u> unload the boxcar.  More importantly, defendants assume Cooper's negligence in arguing the lack of foreseeability; as discussed below, however, there is a genuine factual issue as to whether Cooper's actions were, in fact, negligent.

ii.   *Naranjo v. Sky Chefs, Inc.*

18

Defendants nonetheless suggest this case is analagous to *Naranjo v. Sky Chefs, Inc.*, No. 245320, 2004 WL 2348250 (Mich. Ct. App. Oct. 19, 2004). In *Naranjo*, the defendant had loaded a beverage cart onto an airplane without engaging the brake on the cart. The plaintiff was a flight attendant who was injured when the cart struck her. The court concluded it was not foreseeable that the plaintiff would not perform her duty under FAA regulations to ensure the beverage carts were secure before takeoff. *Naranjo*, 2007 WL 2348250, at *16. The court further noted the plaintiff had presented no evidence that the defendant regularly set the brakes on carts after loading them onto planes, or that flight attendants relied on them to do so. *Id.* The court held the defendant thus had no common-law duty of care to the plaintiff. *Id.* at *17.

*Naranjo* is unpersuasive. First, *Naranjo* predates *Loweke*'s clarification of *Fultz*. Moreover, *Naranjo* is an unpublished decision with no precedential value under Michigan Court Rule 7.215(C)(1).

Even if *Naranjo* were entitled to weight in the Court's analysis, the facts in *Naranjo* differ significantly from those here. Unlike the plaintiff in *Naranjo*, Cooper had no duty with respect to the loading of

the boxcars. Moreover, Cooper violated no regulations and appears to have violated no internal policies (*see infra*). Defendants, on the other hand, may have violated industry standards with respect to dunnage (*see infra*). *Naranjo* does not compel the conclusion that defendants had no duty of care to Cooper.

### b.   Creation of a "new hazard"

As for defendants' second point, the hazard at issue here is the boxcar dunnage – a hazard defendants cannot deny creating. There simply was no preexisting hazard, as there was in *Fultz* and *Hill*, before defendants loaded the boxcar.

In *Fultz*, the snow removal contractor's failure to plow and salt was simply a breach of its contractual obligation. Because the contractor had not done anything, it had created no "new hazard": what remained was the existing hazard of a snow-covered parking lot. Likewise, the dryer installer in *Hill* had done nothing with respect to the existing hazard of the uncapped gas line.

In *Osman*, however, the snow removal contractor had taken the existing hazard – a snow-covered parking lot – and created a "new hazard" based on the manner in which it disposed of the plowed snow.

Here, there was no existing hazard comparable to the snow-covered lot or the uncapped gas line. There was simply an empty boxcar. But defendants loaded the boxcar, creating the "hazard" that ultimately resulted in Cooper's injury. This was a "new" hazard created by defendants, because it resulted from the manner in which defendants loaded the boxcar.

Furthermore, as the *Loweke* court emphasized, the central question is not "whether the hazard was a subject of or contemplated by the contract." *Loweke*, 809 N.W.2d at 559. The central question is "whether a legal duty independent of a contract exist[s], rather than whether defendant's conduct was separate and distinct from the tasks required by the contract or whether the hazard was contemplated by the contract." *Id.* at 560. As discussed above, defendants here still had a "preexisting common-law duty to use ordinary care . . . to avoid physical harm to foreseeable persons." *Id.* at 562.

c.   <u>Duty vs. breach</u>

What defendants are really arguing here is that they were not negligent in loading the boxcar.  (*See* Dkt. 13, Defs' Br. 10 ("There was no new hazard with respect to the loading, just the same condition contemplated by the contractual obligations)).  But this does not bear on the duty of care element of Cooper's negligence claim.   Rather, as Cooper correctly argues, this argument bears on whether defendants breached their duty of care.

Defendants also argue, at some length, that (1) Cooper's alleged negligence in unloading the boxcar and (2) the unloading without incident of another boxcar "of identically-loaded particleboard" immediately afterwards, are both evidence that defendants did not create a "new hazard."  (Dkt. 13, Defs' Br. 10-12).  Again, these points go towards whether defendants were negligent, not whether they had a legal duty to Cooper.

In sum, defendants have not shown that they are entitled to judgment as a matter of law based on the absence of a legal duty to plaintiff.

**B.    Whether Cooper can establish proximate cause**

1.    <u>The parties' arguments</u>

Defendants argue that Cooper's own negligent actions were the sole proximate cause of his injuries.   Alternatively, defendants argue that even if they were negligent in loading the boxcar, Cooper's actions were a superseding cause of his injuries, relieving defendants from liability.   In making the second argument, defendants rely primarily on Cooper's alleged failure to comply with the Home Depot unloading manual to establish that Cooper's actions were not reasonably foreseeable, and therefore were a superseding cause of his injuries. (Dkt. 13, Defs' Br. 15-16).

Cooper responds to the first argument with testimony from an expert witness, Dr. Sher Paul Singh.   (Dkt. 18, Pl.'s Resp. 17-19; Dkt. 18-12, Ex. K to Pl.'s Resp., Singh Dep. [hereinafter "Singh Dep."]).   Dr. Singh testified at his deposition that defendants failed to follow accepted industry standards by using an excessive number of sheets of unsecured particle board dunnage in the boxcar unloaded by Cooper. (Dkt. 18, Pl.'s Resp. 19; Dkt. 18-12, Ex. K to Pl.'s Resp., Singh Dep. 74, 82 [hereinafter "Singh Dep."]).

Cooper responds to the second argument by arguing that his manual unloading of the particleboard sheets was reasonably foreseeable. (Dkt. 18, Pl.'s Resp. 20, 22).

2.   <u>Analysis</u>

a.   <u>There is a genuine dispute of material fact as to whether Cooper was negligent</u>

As an initial matter, there is a genuine dispute of material fact as to whether Cooper's actions in unloading the dunnage by hand were negligent. Defendants cite two bases for finding Cooper's actions negligent: 1) Cooper violated Home Depot's unloading guidelines in 3 ways, and 2) Cooper violated "common sense" by standing in front of the dunnage as he removed it. (Dkt. 21, Defs' Reply 2, 7).

i.   *Cooper's alleged violation of the Home Depot unloading guidelines*

Defendants rely primarily on the Home Depot unloading manual to argue that Cooper's actions were "reckless." (*Id.* at 7). Defendants maintain Cooper 1) failed to visually inspect the load to see if assistance in unloading was necessary; 2) failed to stay within the forklift while unloading the dunnage; and 3) failed to engage the dunnage with the forks of his forklift.

24

(a)      *Whether Cooper failed to visually inspect the load*

Home Depot's unloading manual states that "once the door [of the boxcar] is opened, it is important to visually inspect the car," and "[b]efore starting to unload the boxcar, it is important to visually inspect it.  Call the Department Supervisor if there is any reason to suspect that the car may not be safe to unload."  (Dkt. 13-8, Ex. F to Defs' Br. 8, 10).  Plaintiff testified that he visually inspected the load upon opening the boxcar doors:

> Q. So you had just opened the door and just looked at what was there, is that correct?
>
> A. Yes.
>
> Q. When you looked at it did anything seem unusual?
>
> A. There were no broken bands, there was no shifting, airbags were intact, there was a lot of dunnage.
>
> Q. What do you mean there was a lot of dunnage?
>
> A. More than usual.
>
> ……..
>
> Q. Okay. Did you know that if you ever were confronted with a situation that you felt was unsafe that you could walk away from the situation and ask for a supervisor to come over and assist you?
>
> A. Yes.

………

Q. Did you ever think you should do that in this situation?

A. No, I was – I'd been there 16 years, we remove dunnage from cars all the time . . . I felt I could get the dunnage out safely.

(Cooper Dep. 89-90, 97).   Cooper's testimony creates a genuine dispute of material fact as to whether he failed to visually inspect the load, as defendants maintain.

> (b) *Whether Cooper failed to stay within the forklift while unloading the dunnage*

The unloading manual states that "[t]he <u>preference</u> is always to stay on a forklift when inside a boxcar.  If it is necessary to get off the lift, associates must engage the units inside the car with a forklift." (Dkt. 13-8, Ex. F to Defs' Br. 11) (emphasis added).  It is undisputed that Cooper got off of his forklift and entered the car to remove the dunnage sheets by hand.  But it is not clear that Cooper thereby violated the unloading guidelines, much less that he was "reckless" in getting out of the forklift, as defendants maintain.

The manual clearly states that the <u>preference</u> is to remain in the forklift, and presumes that on at least some occasions it will be

necessary to get out of the forklift and enter the boxcar ("If it is necessary to get off the lift").   Richard Szmagaj and Jonathan Hall testified that workers often got off their forklifts to remove particleboard dunnage by hand, and Richard Jordan testified that Cooper had not violated any Home Depot policy in getting off his forklift to remove the dunnage by hand.  (Szmagaj Dep. 55; Hall Dep. 47, 98-99; Jordan Dep. 59, 69).  Together, this is more than sufficient evidence to create a genuine dispute of material fact as to whether Cooper violated the unloading guidelines by getting out of his forklift.

> (c)   *Whether Cooper failed to engage the dunnage with the forks of his forklift*

It is undisputed that Cooper failed to engage the dunnage with the forks of his forklift.   But that does not appear to have violated the unloading guidelines, which state that associates "must engage the units inside the car with a forklift before they may get off the lift." (Dkt. 13-8, Ex. F to Defs' Br. 11) (emphasis added).  The guideline says nothing about engaging dunnage, only the units – that is, the product. Hall confirmed that the guideline here does not refer to dunnage.  (Dkt. 18-3, Ex. B to Pl.'s Resp., Hall Dep. 99-100).  Neither party maintains that the incident could have been prevented if Cooper had engaged the

<u>units</u> with his forklift. There is a genuine dispute of material fact as to whether Cooper violated unloading guidelines by failing to engage the dunnage with his forklift.

>    ii.   *Cooper's alleged violation of "common sense" by standing where the dunnage fell*

Defendants are left with one basis for arguing that Cooper negligently unloaded the boxcar: that he violated "common sense" by standing where the particleboard sheets fell. Needless to say, "common sense" is vague and is not a basis for granting summary judgment.

In short, there is a genuine dispute of material fact as to whether Cooper was negligent in unloading the boxcar. Because defendants' proximate cause argument depends on the assumption that Cooper was, in fact, negligent, defendants' argument fails to support summary judgment in their favor.

>    b.   <u>There is a genuine dispute of material fact as to whether Cooper's alleged negligence was the sole cause of his injuries</u>

Even if there were no genuine dispute as to Cooper's negligence, Cooper has created a genuine dispute of material fact as to proximate cause. In response to defendants' argument that Cooper's negligence

was the sole cause of his injuries, Cooper has offered evidence in the form of deposition testimony from his expert witness, Dr. Singh, that defendants were negligent in loading the boxcar.   Cooper has also submitted relevant industry guidelines.   The dunnage configuration used by defendants does not appear to conform to any of the approved configurations in the guidelines. (*See* Dkt. 18-7, Ex. F to Pl.'s Resp. 40-41).   Plaintiff has also submitted his own deposition testimony that the number of particleboard sheets used as dunnage was unusual, and Richard Szmagaj's deposition testimony that Szmagaj had previously warned his supervisors that dunnage comprised of numerous particleboard sheets was dangerous.   (Cooper Dep. 90; Szmagaj Dep. 53).   Based on this evidence, a reasonable jury could find that defendants departed from a reasonable standard of care in loading the boxcar.

Defendants respond only by challenging the accuracy of Dr. Singh's opinions.   (Dkt. 21, Defs.' Reply 5-6).   This confirms the presence of a genuine dispute of material fact as to defendants' negligence, and in turn as to whether Cooper's actions were the sole proximate cause of his injuries.

c.   <u>There is a genuine dispute of material fact as to whether Cooper's alleged negligence was a superseding cause of his injuries</u>

Michigan courts have defined proximate cause as "that which in a natural and continuous sequence, unbroken by any new, independent cause, produces the injury, without which such injury would not have occurred." *McMillian v. Vliet*, 422 Mich. 570, 576 (1985).   An intervening cause is one that actively operates to produce a harm after a defendant's negligent conduct has occurred.  *Id.*  If the intervening cause is not "reasonably foreseeable," then it constitutes a superseding cause that "breaks the chain of causation and . . . relieves the original actor of liability." *Id.*

But "[t]he intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about." *Bunda v. Hardwick*, 376 Mich. 640, 669-70 (1965).  By "normal," Michigan courts have meant "that the court or jury, looking at the matter after the event, and therefore knowing the situation which existed when the new force intervened, does not regard its intervention as so extraordinary as to fall outside of the class of normal events."

*Moning v. Alfano*, 400 Mich. 425, 442 n.17 (quoting <u>Restatement of Torts</u> 2d § 443, cmt. b).

Defendants' superseding cause argument is premised on Cooper's actions – getting off the forklift and removing the dunnage by hand – being "reckless" and therefore unforeseeable.  As discussed above, there is, at a minimum, a genuine dispute as to whether Cooper's actions were negligent, let alone "reckless."  It was certainly foreseeable that someone would have to unload the heavy, unsecured particleboard dunnage from the boxcar.  That someone might have to unload the sheets by hand is hardly "so extraordinary as to fall outside the class of normal events."

Defendants have pointed to no cases with similar facts in which Michigan courts found a plaintiff's actions to be a superseding cause. Cooper has cited a case that, by contrast, suggests his actions here were far from a superseding cause: *Hamilton v. Detroit Receiving Hosp.*, No. 273096, 2007 WL 1342560 (Mich. Ct. App. May 8, 2007) (Dkt. 18-16, Ex. O to Pl.'s Resp.).  In that case, a "mentally challenged" man went to defendant's emergency room with viral symptoms.  *Id.* at *1-2.  He was treated and released.  *Id.* at *2.  Six hours later, he ran across I-375,

31

was struck by a car, and killed.  *Id.*  The court held that the plaintiff (decedent's estate) had failed to establish that defendant's discharge of the man was the proximate cause of his death, reasoning that it was not foreseeable that he would run across the interstate six hours later.  *Id.* at *5-6.  Cooper's unloading the boxcar by hand is hardly analogous in terms of foreseeability.

In sum, defendants have failed to establish the absence of a genuine issue of material fact as to proximate causation of Cooper's injuries.  A reasonable jury could conclude that 1) Cooper was not negligent in unloading the boxcar; 2) defendants were negligent in loading of the boxcar; and 3) Cooper's unloading the dunnage by hand was reasonably foreseeable.

## IV.   Conclusion

Defendants have failed to show they owed no duty to Cooper as a matter of Michigan law.  Defendants have also failed to show the absence of a genuine dispute of material fact as to proximate cause. Accordingly, defendants' motion for summary judgment is DENIED.

IT IS SO ORDERED.

Dated: November 4, 2014       s/Judith E. Levy
Ann Arbor, Michigan       JUDITH E. LEVY
     United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 4, 2014.


     s/Felicia M. Moses
     FELICIA M. MOSES
     Case Manager